



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DAVID JUNIOR WASHINGTON, )
)
     Plaintiff, )
)
v. )     Civil Action No. 3:20cv88–HEH
)
MICHAEL BROOKS, M.D., *et al.*, )
)
     Defendants. )

## MEMORANDUM OPINION
### (Resolving Cross-Motions for Summary Judgment)

David Junior Washington ("Plaintiff" or "Washington"), an inmate in the custody

of the Virginia Department of Corrections ("VDOC"), suffers from severe diabetes.

From December 2018 until July 2021, he resided at Sussex II State Prison ("Sussex II"),

where VDOC had contracted with Defendant Armor Correctional Health Services, Inc.

("Armor") to provide medical services to inmates. During his two and a half year stay at

Sussex II, Washington alleges that Armor and their staff, including Defendants Michael

Brooks, M.D. ("Dr. Brooks") and Nurse Jessica Sadler ("Nurse Sadler"),[1] inadequately

treated his severe diabetes. (Second Amended Complaint ("SAC"), ECF No. 83.) In

fact, Washington argues that the Defendants' medical care was so deficient as to violate

the Eighth Amendment's ban on cruel and unusual punishment.[2] (*Id.*)

---

[1] The Court will refer to Armor, Dr. Brooks, and Nurse Sadler collectively as "Defendants."

[2] While the Eighth Amendment claim may be Plaintiff's most serious allegation, he also brings a
litany of related negligence and medical malpractice state law claims. Counts I and II, through
42 U.S.C. § 1983, bring a claim against all Defendants for violating Plaintiff's Eighth
Amendment rights. In Count III, Plaintiff brings a substantive due process claim, also through

The parties have now filed cross-motions for summary judgment. Defendants seek summary judgment on almost all of Plaintiff's claims.[3] (ECF No. 111.) Plaintiff seeks summary judgment only on the Eighth Amendment claims against Dr. Brooks and Armor, the medical malpractice claims against the same, and the negligent hiring and retention claims against Armor. (ECF No. 123; Pl.'s Mem. Supp. at 8, ECF No. 124.) The parties submitted memoranda in support of their respective positions and the Court heard oral argument on the issues on December 6, 2021.

On Plaintiff's core Eighth Amendment claims against Dr. Brooks (Counts I and II), medical malpractice claims (Counts VI and VII), negligent hiring claim (Count IX) and his negligent retention claim (Count X), the Court will deny Defendants' Motions for Summary Judgment. On Plaintiff's Eighth Amendment claims against Nurse Sadler and Armor (Counts I and II), substantive due process claim (Count III) and negligent infliction of emotional distress claim (Count XI), the Court will grant Defendants' Motion for Summary Judgment. The Court will deny Plaintiff's Motion for Summary Judgment in its entirety.

_____

Section 1983, against Defendants. Counts IV and V were dismissed by the Court at the motion to dismiss stage. (Order, ECF No. 106.) Counts VI and VII contain claims against Defendants for medical malpractice under Virginia law. Count VIII was also dismissed by the Court at the motion to dismiss stage. (Order, ECF No. 127.) In Counts IX and X, Plaintiff brings a claim against Armor for negligent hiring and negligent retention, respectively. Finally, in Count XI, Plaintiff brings a claim against all three Defendants for Negligent Infliction of Emotional Distress.

[3] Defendants argue for summary judgment on Counts I, II, III, and XI in their entirety. (Defs.' Mem Supp., ECF No. 118.) Defendants also ask for summary judgment on Counts VI and VII against Nurse Sadler and, to a limited extent, Armor. (*Id.*) Finally, Defendants seek summary judgment on Counts IX and X against Armor. (*Id.*)

## I.   BACKGROUND[4]

In reviewing cross-motions for summary judgment, the Court must consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In considering each motion, the Court will resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party. *Id.* (internal quotation marks and citation omitted). The following narrative represents the undisputed facts for the purpose of resolving the cross-motions for summary judgment.

### A.   Defendants' Roles and Responsibilities

In 2015, VDOC contracted with Armor to provide medical care and services for inmates at Sussex II. (Armor Contract at 1, ECF No. 124-6.) As part of the Contract, Armor had to adopt VDOC policies in addition to any of its own policies governing medical care. (*Id.* at 2.) Armor employed one Medical Director, one Nurse Practitioner, registered nurses ("RNs"), and practical nurses at Sussex II. (Dr. Brooks Dep. at 92:4–18, ECF No. 118-6.) Dr. Brooks is a licensed physician and was employed as the Medical Director of Armor's operations at Sussex II at all relevant times. (Dr. Brooks Decl. ¶ 1, ECF 118-8.) Dr. Brooks was also the Medical Authority at Sussex II. Armor's Contract with VDOC and VDOC Operating Procedures detail the Medical Authority's

---

[4] The facts relevant to Plaintiff's negligent hiring, negligent retention, and negligent infliction of emotional distress claims (Counts IX, X, XI) and some of the facts relevant to the medical malpractice claims (Counts VI and VII) are not included in this section. Instead, the Court recites them in the discussion section relating to those Counts below.

roles and responsibilities. (Armor Contract; VDOC Op. Proc., ECF No. 124-8.) As Medical Director, Medical Authority, and the only physician at Sussex II, Dr. Brooks had almost full authority over inmate treatment. (VDOC Op. Proc. at 3; *see generally* Sadler Dep., ECF No. 124-3.)

Nurse Sadler is a licensed RN and served as the Health Services Administrator (the "HSA") of Armor's operations at Sussex II from September 24, 2018, until April 5, 2020. (Sadler Decl. ¶ 3; ECF No. 118-9.) As the HSA, Nurse Sadler manages personnel matters, assigns work tasks, trains Armor employees, and develops nonmedical procedures. (*Id.* ¶ 5.) As HSA, Nurse Sadler also reviewed grievances filed by inmates and organized outside specialist appointments ordered by Dr. Brooks. (Sadler Dep. at 45:20–46:2, 158:12–160:8, ECF No. 130-6.)

When treating inmates, Armor nursing staff would fill out a "Nursing Evaluation Tool" or record details in an inmate's chart. (Younce Dep. 36:5–37:17, ECF No. 118-4.) Dr. Brooks reviews Nursing Evaluation Tools and inmate charts within 24–72 hours. (Dr. Brooks Dep. II, 15:21–17:14.) Dr. Brooks often signs Nursing Evaluation Tools and other medical records to affirm that he has read them.[5] (*Id.*)

**B.      Medical Care Related to Washington's Toe Ulcer**

Washington was diagnosed with diabetes in 2008 or 2009. (Washington Dep. 16:19–22, ECF No. 118-12.) He was subsequently convicted and sentenced to a term of

---

[5] Defendants specifically do not dispute that "Dr. Brooks reviews Nursing Evaluation Tools and signs off on them." (Defs.' Mem Supp. at ¶ 23, ECF No. 18.)

imprisonment in the custody of VDOC.  Washington was designated to Sussex II in December of 2018.  (Dr. Brooks Decl. ¶ 3.)

On January 9, 2019, Washington submitted an Informal Complaint stating that his foot ached.  (Med. R. at 3, ECF Nos. 124-11, 12.)  On January 22, Dr. Brooks saw Washington for his increased blood pressure and toe ulcer.  (*Id.* at 4.)  To address the toe ulcer, Dr. Brooks ordered daily dressing changes and wound care and planned to follow up 10 days later.  (*Id.*)  At this point, Dr. Brooks did not prescribe antibiotics, nor did he refer Washington to a wound care specialist or a hospital.  On January 24, Washington filed an Emergency Grievance asking for a dressing change and complaining that his toe smelled.  (Med. R. at 5.)  The same day, a nurse saw Washington and filled out a Nursing Evaluation Tool that stated Washington's pain was a 7 out of 10 and his ulcer measured 1 cm by 1.5 cm.  (*Id.* at 6.)  Dr. Brooks did not follow up on the Nursing Evaluation Tool.

In the afternoon on January 27, Washington filed an Emergency Grievance complaining that his leg ached and was swollen to twice its size.  (*Id.* at 7.)  On January 28, Nurse Practitioner Nnebuisi Alaedu tended to Washington and prescribed Tylenol, antibiotics, continued dressing changes, and observation.  (Alaedu Dep. at 130:2–131:21, ECF No. 118-5.)  At this point, Washington's ulcer had expanded and was draining fluid and he had developed a fever.  (*Id.*)  Washington received antibiotics, at the earliest, on January 28 and at the latest, late on January 29.[6]  From this point until January

---

[6] Dr. Brooks claims Washington received antibiotics on January 28 while Medical Records state they started on January 29.  (Dr. Brooks Decl. ¶ 7; Med. R. at 32.)

31, Washington's condition continued to worsen.  (Alaedu Dep. at 131:22–133:8.)  On

January 31, Armor staff alerted Dr. Brooks that Washington's condition still had not

improved.  (Dr. Brooks Decl. ¶ 8.)  Brooks ordered Washington be sent to the Emergency

Room at Southside Regional Medical Center ("SRMC").  (*Id.*)

At SRMC, doctors diagnosed Washington with an infected right big toe and

gangrene and treated him with intravenous antibiotics.  (*Id.*)  On February 12, the doctors

at SRMC amputated Washington's toe to stop the infection from spreading to the rest of

his leg.  (*Id.*)[7]

## C.    General Diabetes Treatment

Before arriving at Sussex II, Washington had already been diagnosed with insulin-

dependent diabetes and diabetic neuropathy among other conditions.  (Dr. Brooks Dep. at

107:12–109:5.)  At Sussex II, Washington had his blood sugar levels checked 1–3 times a

day by nurses.  (Stanford Dep. at 38:7–17, ECF No. 118-3; Med. R. II at 2, ECF No. 130-

2.)  Nurses also generally provided him with insulin or oral diabetic medications.

(Stanford Dep. at 38:9–17.)  Additionally, Washington was scheduled to be seen by Dr.

Brooks every six months in the chronic care clinic.  (*Id.*)

Between March and August 2019, as a result of his uncontrolled diabetes,

Washington suffered from at least 10 severe hypoglycemic events.  (Med. R. at 72–85,

---

[7] The Court need not recite the medical treatment related to Washington's toe ulcer after his
amputation.  While this period of treatment may be relevant to Washington's medical
malpractice claims generally, it is not in dispute in the parties' Motions for Summary Judgment.

87–89.)[8]  A severe hypoglycemic event occurs when the body's blood glucose level dips

below 50 mg/dL.[9]  (Dr. Madoff Dep. at 182:3–19, ECF No. 124-14.)  Severe

hypoglycemic events can result in death or serious injury.  (Dr. Madoff Dep. at 182:21–

183:7.)  As a result of many hypoglycemic events, Washington suffered traumatic

injuries, including breaking his teeth and splitting his lip open.  (Med. R. at 135 (breaking

teeth); *id.* at 72 (moaning and unresponsive); *id.* at 75 (having a seizure).)

When Washington experienced a hypoglycemic event, nurses would administer

glucose gel to raise his blood sugar level, monitor his blood sugar level until it improved,

and alert Dr. Brooks if things did not improve.  (Stanford Dep. at 33:18–35:5; Younce

Dep. 38:15–39:22.)[10]  On some occasions, Dr. Brooks responded to a hypoglycemic

event by changing Washington's insulin or other drug dosage and by educating him on a

diabetic diet.[11]  (Dr. Brooks Decl. ¶¶ 15, 18.)  Dr. Brooks never consulted with or referred

---

[8] Plaintiff inconsistently states how many hypoglycemic events he suffered from throughout his briefing.  At one point, he states he suffered from 32 hypoglycemic events from March 2019 until November 2019.  (Pl.'s Mem. Supp. at 6.)  What is clear is that Plaintiff suffered from repeated hypoglycemic events.  The exact number is not important to the Court's analysis.

[9] In contrast, a hyperglycemic event occurs when the body's blood glucose level becomes too high.  Washington also suffered repeated and severe episodes of hyperglycemia that could negatively impact his overall health.  (Dr. Davis Dep. at 122:1–21, ECF No. 124-19.)

[10] Washington disputes that these standing orders were always followed when he had low blood sugar, but only cites one instance where he was given a cupcake instead of glucose.  (Med. R. II at 2.)

[11] Washington, however, states that a diabetic diet is close to impossible in Sussex II.  (Washington Dep. at 28:1–25, ECF No. 130-13.)  While Dr. Brooks claims that Washington sometimes skipped meals, Washington himself denies this.  (*Id.* at 106:1–107:15.)

Washington to an outside endocrinologist from December 2018 to July 2019.  (Pl.'s

Mem. Supp. at 6.)

In response to a complaint, which Washington filed with the warden, and a letter

from an outside physician, on August 5, 2019, Dr. Brooks admitted Washington to the

infirmary to monitor his diabetes.[12]  (Med. R. III at 19, ECF No. 130-23.)  On August 5,

in response to Washington's complaint and the outside physician's letter, Dr. Brooks also

referred Washington to an outside endocrinologist.  (*Id.*)  Washington saw, Dr. Trang Le,

an endocrinologist, on August 15.  (Med. R. at 91–98.)  Dr. Le recommended changing

Washington's insulin dosage, suggested that Washington have emergency glucose

available, and asked for a follow-up appointment.  (*Id.*)

On August 30, Dr. Brooks released Washington from the infirmary and

emphasized the effects of his diet on his blood sugar level.  (Dr. Brooks Decl. ¶ 40.)  Dr.

Brooks claims that Washington ate many commissary items (sweet snacks) which

contributed to his uncontrolled diabetes.  (*Id.* ¶ 41.)  Washington claims he maintained a

large amount of commissary items in his cell, for the purpose of avoiding hypoglycemic

events.  (Washington Dep. at 158:4–6; Dr. Madoff Dep. at 130:8–18, ECF No. 130-10.)

Washington saw Dr. Le for a follow-up appointment on November 21.  (Med. R.

at 106–10.)  Dr. Le again recommended changing Washington's insulin dosage and

scheduling follow-up appointments.  (*Id.*)  The parties dispute whether Dr. Brooks

---

[12] Outside professionals notified Armor staff of Washington's serious issues at least twice, but
the parties dispute whether other letters were ever actually received by Armor.  (Letters, ECF
No. 124-20; Cabell Dep. at 76:4–80:8, ECF No. 124-7.)

followed the recommendations of Dr. Le long term.  Further follow-up appointments
were scheduled for February 6, 2020, and May 21, 2020 but both were canceled by the
outside provider.  (*Id.* at 111, 119.)  After the May 21 appointment was scheduled, Dr.
Brooks noted that a new appointment was a "medical necessity."  (*Id.* at 119.)  While in-
person outside referrals were restricted in 2020 due to the coronavirus pandemic,
telehealth appointments were still available.  (Cabell Dep. at 115:16–20.)

During all this time, Washington continued to suffer from hypoglycemic events.
(Med. R. at 112–18, 120–31, 133–35.)  Fourteen months after his last appointment,
Washington finally saw Dr. Le again for a follow-up appointment on January 21, 2021.
(*Id.* at 137–40.)  Washington was transferred out of Sussex II in July 2021.  (Dr. Brooks
Decl. ¶ 3.)

## II.  STANDARD OF REVIEW

The standard for review of cross-motions for summary judgment is well settled in
the Fourth Circuit:

> On cross-motions for summary judgment, a district court should "rule upon
> each party's motion separately and determine whether summary judgment
> is appropriate as to each under the [Federal Rule of Civil Procedure] 56
> standard."  Summary judgment is appropriate only if the record shows
> "there is no genuine issue as to any material fact and that the movant is
> entitled to judgment as a matter of law."

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in
original) (first quoting *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins.
Co.*, 176 F.3d 794, 797 (4th Cir. 1999), and then quoting Fed. R. Civ. P. 56(c)).

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id.*

To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another" or "the mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (first quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985), and then quoting *Anderson*, 477 U.S. at 252). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a

question of fact must be adequate . . . ." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson* 477 U.S. at 252). "Thus, if the evidence is 'merely colorable' or 'not sufficiently probative,' it may not be adequate to oppose entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 249–50). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *See Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## III.   DISCUSSION

### A.   Counts I and II against Dr. Brooks and Nurse Sadler

In Counts I and II, Plaintiff brings a claim, via 42 U.S.C. § 1983, that Defendants violated his Eighth Amendment rights by inadequately providing him with medical care.[13] The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "encompasses 'the treatment a prisoner receives in prison and the conditions under which he is confined.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). Thus, an inmate can bring a claim alleging that an official's "deliberate indifference to [his] serious medical needs . . . constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* An inmate who alleges

---

[13] Section 1983 is not "a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).

such a claim must satisfy the two-pronged test set forth in *Farmer v. Brennan*. 511 U.S. 825, 832 (1994); *Scinto*, 841 F.3d at 225; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The first prong of the *Farmer* test is the objective prong. *Scinto*, 841 F.3d at 225. In a case involving medical care, "the *Farmer* test requires plaintiffs to demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). In this case, the parties do not dispute that Washington's toe ulcer and his uncontrolled diabetes are serious medical needs and thus satisfy the objective prong.

The second prong of the *Farmer* test is the subjective prong. *Scinto*, 841 F.3d at 225. It calls for a plaintiff to show that the defendant acted with deliberate indifference. *Id.* Put another way, a plaintiff must show that the defendant knew of and disregarded an excessive risk to an inmate's health. *Id.* (citing *Farmer*, 511 U.S. at 837).[14] This requires "two slightly different aspects of an official's state of mind." *Iko*, 535 F.3d at 241. It requires (1) "*actual knowledge of the risk of harm* to the inmate" and (2) recognition "'that *his actions were insufficient*' to mitigate the risk of harm to the inmate arising from his medical needs." *Id.* at 241 (emphasis in original) (quoting *Young v. City of Mt. Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001)); *see Parrish ex rel. Lee v. Cleveland*, 372

---

[14] Some courts have described this standard as similar to "recklessness of the subjective type used in criminal law." *Scinto*, 841 F.3d at 225 (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)); *see* Farmer, 511 U.S. at 835.

F.3d 294, 303 (4th Cir. 2004); *Scinto*, 841 F.3d at 226.  Whether a defendant knew of the "substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842; *see Scinto*, 841 F.3d at 226.  This includes evidence "that a prison official knew of a substantial risk from the very fact that a risk was obvious." *Id.*; *see Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

In this case, Dr. Brooks administered *some* medical treatment to Washington to address both his toe ulcer and his uncontrolled diabetes.  Where a prison official provides some medical treatment to address an inmate's serious medical need, he may still be liable if he does not provide "*constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in original).  "Grossly incompetent or inadequate care can constitute deliberate indifference." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990); *see De'lonta*, 708 F.2d at 526 (quoting similar language); *Cf. Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021) ("[T]he treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)).[15]

The parties firmly disagree on whether the record supports the subjective prong. First, regarding Washington's toe ulcer, Defendants argue that Dr. Brooks treated

---

[15] Defendants argue that Washington's claims are merely a disagreement with Dr. Brooks' medical care. "'Disagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." *Hixson*, 1 F.4th at 303 (quoting *Wright v. Collins*, 766 F.2d at 849).  Exceptional circumstances exist where the medical treatment was grossly incompetent. *Id.* (quoting *Miltier*, 896 F.2d at 851).

Washington within his medical judgment and did not know of or disregard any substantial risk. (Defs.' Mem. Supp. at 23.) Plaintiff argues that Dr. Brooks knew of the substantial risk of infection from the toe ulcer but disregarded that risk in the course of his treatment. (Pl.'s Mem. Supp. at 17–19.)

As to Dr. Brooks' treatment of the toe ulcer, there are genuine issues of material facts in dispute, precluding summary judgment. On January 22, 2019, Dr. Brooks saw Washington's toe ulcer and ordered daily wound care from nurses.[16] (Med. R. at 4) Through medical records and other means, he expected the nursing staff to alert him if Washington's condition worsened or improved. (Dr. Brooks Dep. at 194:14–196.) On January 24, 2019, Washington complained that his dressings were not changed and that his foot smelled. (Med. R. at 5.) According to Plaintiff's expert, Dr. David Madoff, "it would have been obvious to any reasonable physician on January 24, 2019, [that] Washington's right toe ulceration was progressing and required immediate expert comprehensive care." (Report of Dr. Madoff at 6, ECF No. 124-16; *see id.* at 19–20.) Dr. Madoff further opined that Dr. Brooks' care from January 22 to January 24, 2019 was "extremely poor." (Dr. Madoff Dep. at 151:13, ECF No. 124-14.) A jury could infer from this evidence that an obvious risk threatened Washington's health and Dr. Brooks knew of this risk because of its obviousness. *Farmer*, 511 U.S. at 842.

---

[16] While it is uncontroverted that Dr. Brooks ordered daily wound care for Washington's toe ulcer, the parties dispute how often he received that care from Armor nurses. Here, it is only relevant that Dr. Brooks ordered wound care.

Dr. Brooks' own testimony also shows that he may have consciously disregarded the risk to Washington. Dr. Brooks stated that, based on Washington's condition on January 22, 2019, his "ulcer can become progressively worse. He may develop cellulitis. He may develop other toes being affected . . . ." (Dr. Brooks Dep. at 194:14–195:2, ECF No. 130–3.) From this evidence, a jury could reasonably infer that Dr. Brooks knew of the open and obvious risk of infection, consciously disregarded that risk, and only responded with treatment that was grossly incompetent. *Farmer*, 511 U.S. at 842 (noting that circumstantial evidence may be cogent evidence of the subjective prong).

Conversely, a reasonable jury could also conclude that Dr. Brooks' actions relating to the toe ulcer were not grossly incompetent or reckless. While Plaintiff's expert claims that his treatment grossly failed to comport with the acceptable standard of care, Defendants cite countervailing evidence to suggest it was reasonable. Defendants' expert, Dr. Alfred Joshua, stated that Dr. Brooks' treatment of the toe ulcer was reasonable. (Dr. Joshua Report at 15–16, ECF No. 132-6; Dr. Joshua Dep. Part II at 27:21–30:22, ECF No. 132-9.) The Court, however, cannot weigh the evidence or decide what witness is more credible at the summary judgment stage. *Williams*, 372 F.3d at 667.

Second, regarding Washington's uncontrolled diabetes, Dr. Brooks argues that he was not deliberately indifferent because he regularly monitored Washington's condition and changed his treatment when appropriate. (Defs.' Mem. Supp. at 22–23.) Plaintiff responds that Dr. Brooks' delay in seeking out an endocrinologist to evaluate Washington is clear evidence of deliberate indifference. (Pl.'s Mem. Supp. at 10–15.)

Like the toe ulcer, there is a genuine dispute as to whether Dr. Brooks' treatment of Washington constitutes deliberate indifference. From his arrival at Sussex II until August 2019, Washington suffered from at least ten hypoglycemic events often resulting in seizures or loss of consciousness. (Med. R. at 72–85, 87–89.) In response, nurses would administer glucose, a short-term solution to raise Washington's blood sugar. (Stanford Dep. at 33:18–35:5; Younce Dep. 38:15–39:22.) Sometimes, Dr. Brooks would review Washington's diabetes treatment and admit him into the infirmary for monitoring if necessary. (Med. R. III at 19.) Despite the pattern of hypoglycemic events, Dr. Brooks did not refer Washington to an outside endocrinologist until August 5, 2019. (*Id.*)

Plaintiff's expert, Dr. Madoff, opines that "[t]here is absolutely no rationale for delaying referral to an endocrinologist . . . following no more than one or two level 3 hypoglycemic events due to the life-threatening potential of these events. Need for timely referral would have been obvious to any reasonable physician." (Dr. Madoff Report at 13–14.) From this evidence, and the fact that Washington suffered at least ten hypoglycemic events before being referred to a specialist, a jury could find that Dr. Brooks' treatment was "so grossly incompetent as to shock the conscience" and the risks to Washington were so obvious that Dr. Brooks knew about them. *Hixson*, 1 F.4th at 303; *Farmer*, 511 U.S. at 842.

After Washington saw an endocrinologist on August 15, 2019 and November 21, 2019, no other follow-up appointments occurred until January 21, 2021. (Med. R. at 111, 119, 137–40.) During that time Washington suffered eighteen more serious

hypoglycemic events. (*Id.* at 112–18, 120–31, 133–35.)  By May 13, 2020, Dr. Brooks concluded that further outside endocrinologist appointments were a "medical necessity." (*Id.* at 119); *see Creech v. Nguyen*, No 97-6925, 1998 WL 486354 at *6 (4th Cir. 1998) (finding that a reasonable jury could infer deliberate indifference from a doctor's notation that a follow-up appointment should be scheduled "ASAP"); *Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) ("[F]ailure to provide the level of care that a treating physician himself believes is necessary may constitute deliberate indifference.")

Two follow-up appointments were scheduled for Washington, but they were canceled by the provider.  (*Id.* at 111, 119.)  After those appointments were canceled, there is no evidence in the record that Dr. Brooks attempted to schedule an alternative endocrinologist consultation despite his recognition that it was medically necessary.  For example, telehealth appointments were possible at Sussex II.  (Cabell Dep. at 115:16–20.) Yet Dr. Brooks never scheduled one for Washington between November 21, 2019 and January 21, 2021, beyond those that were canceled.  Viewed collectively, a reasonable jury could infer that Dr. Brooks knew of and disregarded the risks to Washington.

This is not to say that a reasonable jury *must* conclude that Dr. Brooks was deliberately indifferent.  Defendant's expert, Dr. Joshua Cohen, noted in his report that "there is no evidence to suggest that [Washington]'s hypoglycemic events would have decreased significantly had Dr. Brooks referred [Washington] to an endocrinologist earlier . . . ."  (Dr. Cohen Report at 17, ECF 132-5.)  Defendant's other expert, Dr. Joshua comes to a similar conclusion: "[E]ven if an endocrinologist saw [Washington] earlier, he would not have improved his blood glucose levels as his dietary noncompliance would

have continued." (Dr. Joshua Report at 16.)  Dr. Brooks also maintains that treating Washington's diabetes was difficult because Washington would disregard his dietary instructions and eat large amounts of commissary snacks.  (Dr. Brooks Decl. ¶ 6, 11, 31, 41.)  Thus, there is a genuine dispute of material facts as to whether Dr. Brooks was deliberately indifferent to Washington's serious medical needs.  The Court will deny both Dr. Brooks' and Plaintiff's Motions for Summary Judgment on Counts I and II against Dr. Brooks.

In Counts I and II, Plaintiff also alleges that Nurse Sadler was deliberately indifferent to Washington's serious medical needs.  However, the record shows that Nurse Sadler had a more limited role in Washington's treatment at Sussex II.  As HSA, Nurse Sadler reviewed grievances filed by Washington and organized outside specialist appointments once they were made by Dr. Brooks.  (Sadler Dep. at 45:20–46:2, 158:12–160:8.)  Nurse Sadler knew of Washington's uncontrolled diabetes and hypoglycemic events.  (*Id.* at 108:10–109:3, 158:12–18.)  This evidence is sufficient to show "*actual knowledge of the risk of harm* to the inmate." *Iko*, 535 F.3d at 241 (emphasis in original).

Yet, Plaintiff points to no additional evidence that Nurse Sadler recognized "[her] '*actions were insufficient*' to mitigate the risk of harm to the inmate arising from his medical needs." *Id.* (quoting *Young*, 238 F.3d at 575–76).  She routed all of Washington's grievances to medical staff and organized outside specialist appointments when Dr. Brooks scheduled them.[17]  Those actions are not grossly incompetent and,

---

[17] An HSA may be held liable when she flatly declines to refer an inmate for treatment. *See Lynch v. Wexford Health Sources*, No. 2:13cv1470, 2016 WL 2944688 at *9 (S.D.W. Va.

Nurse Sadler cannot be held liable for refusing to question or interfere with Dr. Brooks' treatment of Washington. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (granting summary judgment for prison officials who refused to contravene Doctor's treatment decisions); *Cf. Miltier*, 896 F.2d at 854.[18] Thus, no reasonable jury could find that Nurse Sadler was deliberately indifferent to Washington's serious medical needs and the Court will grant Defendants' Motions for Summary Judgment on Counts I and II as to Nurse Sadler.

**B.    Counts I and II against Armor**

Also in Counts I and II, Plaintiff alleges that Armor was deliberately indifferent to Washington's serious medical needs in violation of the Eighth Amendment. While the Court agrees with Plaintiff that there is a genuine dispute of material facts as to whether Armor's employee, Dr. Brooks, violated the Eighth Amendment, Armor may not "be held liable *solely* because it employs a tortfeasor . . . ." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Instead, Armor may only be liable where its "policy or custom" is the "'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)). While the policy or custom doctrine originated as a

---

May 20, 2016). Here, there is no evidence in the record that Nurse Sadler routinely declined to refer Washington for treatment.

[18] There are scenarios where "repeatedly pass[ing] the buck" on an inmate's treatment can be evidence of deliberate indifference. *Gordon v. Schilling*, 937 F.3d 348, 358 (4th Cir. 2019). This case, however, does not fit this scenario. Unlike in *Gordon*, in this case, Sadler had no knowledge that the treatment Washington was receiving from Dr. Brooks was ineffective. *Id.* (noting that the nurse defendant knew the prison physician could do nothing to help the inmate in question even if the inmate was referred to them).

limitation on § 1983 municipal liability, it equally applies to the liability of private

corporations. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1985).

Armor argues that it has no policy or custom that could render it liable to Plaintiff.

> Policy or custom liability can arise in four instances:
>
> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 462, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d

215, 217 (4th Cir. 1999)).  Plaintiff argues that a policy or custom was created either

because Dr. Brooks is a final policymaker of Armor, or because Armor had a custom of

delaying and denying treatment to Washington. (Pl.'s Mem. Opp'n at 21–24, ECF No.

130.)

The Court turns first to whether Dr. Brooks is a final policymaker of Armor.  A

single action taken by a policymaker can constitute a policy or custom such that the

policymaker's employer can be held liable under § 1983. *Pembaur v. City of Cincinnati*,

475 U.S. 469, 477 (1986); *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir.

1999). "The touchstone inquiry is whether 'the decisionmaker possesses final authority

to establish municipal policy with respect to the action ordered.'" *Hunter v. Town of

Mocksville*, 897 F.3d 538, 554–55 (4th Cir. 2018) (quoting *Liverman v. City of

Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)).

20

Whether someone is a policymaker is dependent upon state law. *Austin*, 195 F.3d at 715; *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).[19]  In the context of a private corporation, "state law" includes relevant local ordinances, contracts, policies, and manuals. *See Austin*, 195 F.3d at 729–30.  While a municipality or corporation may delegate its final policymaking authority to subordinate officials, the Court cannot "assum[e] that municipal policymaking lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126; *see Hunter*, 897 F.3d at 555. Importantly, when a subordinate official's decisions are subject to review by someone else, the subordinate official's decisions cannot be considered "policy." *Praprotnik*, 485 U.S. at 127.

Considering these principles, the question in this case is whether Dr. Brooks, the Medical Authority at Sussex II, served as Armor's policymaker in deciding what medical care inmates received, including outside referrals and diabetic treatment.  VDOC's Operating Procedures, which Armor is contractually obligated to follow, vested Dr. Brooks, as the Medical Authority, with the power to make "[f]inal clinical judgments." (VDOC Op. Proc. at 3; *see* Armor Contract at 2.)  The Operating Procedures specifically note that "[c]linical decisions are the sole province of the responsible health care provider and are not countermanded by non-clinicians."  (VDOC Op. Proc. at 3.)

However, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to

---

[19] Being a question of state law, the Court, not the trier of fact, decides who qualifies as a policymaker. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124–25 (1988).

municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481–82. Discretionary decisions must be *final* in that they are "not constrained by policies not of that official's making" and not "subject to review by the municipality's authorized policymakers." *Praprotnik*, 485 U.S. at 127; *see Hunter*, 897 F.3d at 555 (noting the difference between making policy and making final implanting decisions).

While Dr. Brooks has discretion to make clinical decisions, those decisions are constrained by VDOC and Armor's policies and review from higher officials. VDOC has established "Treatment Guidelines" including "Medical (Standard Treatment) Guidelines" that physicians like Dr. Brooks must comply with. (VDOC Op. Proc. at 10.) Moreover, Armor or VDOC can take disciplinary action against employees for violating "policy regarding clinical care or health care management." (*Id.* at 8–9.) Thus, according to state law and applicable documents, Dr. Brooks is not a final policymaker such that Armor is liable for his decisions. *Lytle*, 326 F.3d at 471; *see Shehee v. Saginaw Cty*, 86 F. Supp. 3d 704, 713 (E.D. Mich. 2015) (finding that physician was not a policymaker where he made final clinical decisions but was still required to abide by medical guidelines set by employer).[20]

Next, Plaintiff argues that Dr. Brooks' delays in providing medical care represent a practice that is so "persistent and widespread" as to constitute a "custom or usage with

---

[20] Plaintiff relies on *Rodrigue v. Morehouse Detention Center*, No. 09-985, 2012 WL 4483438 (W.D. La. Sept. 28, 2012). There, Louisiana law designated the local sheriff as the policymaker over a parish jail. *Id.* at *13. In turn, the Morehouse Parish Sheriff testified that he delegated full policymaking authority to the jail doctor. *Id.* The facts in *Rodrigue* baldly contrast with the facts in this case. Here, Armor and VDOC maintained policy oversight and review over Dr. Brooks and there is no clear statement that ceded complete policymaking authority to him.

the force of law." *Carter*, 164 F.3d at 217; (Pl.'s Mem. Opp'n at 23). For the sake of argument, the Court assumes that a custom can be inferred from a pattern of behavior toward a single individual. *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (holding that repeated unconstitutional behavior against one individual may be enough to prove a custom). Even so, Plaintiff fails to point to any evidence in the record that Dr. Brooks' inadequate treatment was persistent enough to create a custom attributable to Armor.

Again, Plaintiff alleges that two portions of his medical treatment were so inadequate as to be unconstitutional: (1) the treatment of his toe ulcer and (2) the delay in sending him to an outside endocrinologist despite his constant hypoglycemic events. (Pl.'s Mem. Supp. at 10–19.) Dr. Brooks only treated Washington for a toe ulcer once, so there could not possibly be any persistent custom there.

As to Washington's diabetes treatment, Plaintiff argues that there was a pattern of unconstitutional conduct in this case, because Dr. Brooks and Armor nurses merely revived Washington after dozens of hypoglycemic events and offered no further treatment. (Pl.'s Mem. Opp'n at 23.) Here, the alleged unconstitutional conduct was inaction, witnessing the repeated hypoglycemic events and *delaying a referral to an outside endocrinologist*. However for their inaction to have constitutional implications, Plaintiff would have to show a pattern or persistent practice of a delay in a referral and *not just* the underlying hypoglycemic events. *See Carter*, 164 F.3d at 217. Dr. Brooks delayed Washington's endocrinologist appointment only twice: once from December 2018 until August 2019, and again from November 2019 until January 2021. (Med. R.

III at 19; Med. R. at 111, 119, 137–40.)  An incident happening twice does not prove that it is so persistent and widespread as to create a custom.  *See Oyenik*, 696 F. App'x at 794 (finding that a practice happening at least a dozen times was enough to create a custom); *Lytle*, 326 F.3d at 473 ("It is well settled that 'isolated incidents' . . . are not sufficient to establish a custom or practice." (quoting *Carter*, 164 F.3d at 220)).

Therefore, the Court finds that Armor cannot be liable for an Eighth Amendment violation because it had no "policy or custom" of violating a constitutional right. *Spell*, 824 F.2d at 1387 (4th Cir. 1987).  Thus, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment on Counts I and II as to Armor.

C.     **Count III**

In Count III, Plaintiff alleges that Defendants violated his substantive due process rights by invading his "bodily integrity."  (SAC ¶ 273.)  Plaintiff argues that his bodily integrity was violated when Defendants failed to treat his toe ulcer, which directly led to his toe amputation.  (*Id.* ¶ 275.)  However, "[i]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

As discussed in detail above, Plaintiff's claim here, that he received inadequate medical care while incarcerated at Sussex II, clearly falls within the Eighth Amendment. *Gamble*, 429 U.S. at 104.  Moreover, Plaintiff points to no evidence that his bodily

24

integrity was violated in any way beyond the toe amputation that was the result of Defendants' medical treatment. (*See* SAC ¶¶ 271–280; Pl.'s Mem. Opp'n at 24–25); *Cooleen v. Lamanna*, 248 F. App'x 357, 362 (3d Cir. 2006) (noting that the viability of plaintiff's Eighth Amendment claim requires the dismissal of his substantive due process claim.) Thus, the Court will grant Defendants' Motion for Summary Judgment as to Count III.

**D.      Counts VI and VII**

In Counts VI and VII, Plaintiff brings claims of medical malpractice against Dr. Brooks, Nurse Sadler, and Armor. Plaintiff asks for summary judgment on these claims against Dr. Brooks and Armor because the undisputed evidence shows that they breached the duty of care. (Pl.'s Mem. Supp. at 24.)

To prove medical malpractice in Virginia, a plaintiff must show that the defendants owed him a duty, defendants breached that duty, and that the breach caused plaintiff damages. *Raines v. Lutz*, 341 S.E.2d 194, 196 (1986). These elements are normally proven through expert testimony. *Bitar v. Rahman*, 630 S.E.2d 319, 323 (2006). Washington argues that Armor and Dr. Brooks breached the duty of care in their treatment of his toe ulcer and uncontrolled diabetes, and he cites to extensive deposition testimony by his experts. (Pl.'s Mem. Supp. at 24–26.)

Defendants, however, marshal their own experts to rebut this evidence. (Defs.' Mem. Opp'n at 18–21, ECF No. 132.) For example, Defendants' expert, Dr. Joshua, testified that Dr. Brooks and Armor staff "complied with the standard of care" in their treatment of Washington and did not cause his toe amputation. (Dr. Joshua Dep. Part I at

64:10–65:5, 117:9–123:6, ECF No. 132-8.)[21]  Dr. Cohen similarly testified that Dr.

Brooks' medical treatment of Washington's diabetes, including the timing of

endocrinologist referrals, met the standard of care.  (Dr. Cohen Dep. at 92:8–93:6, 96:6–

97:6, ECF No. 132-7.)[22]  At the summary judgment stage, the Court cannot resolve

whose experts are more credible.  *See Williams*, 372 F.3d at 667.  Thus, the Court will

deny Plaintiff's Motion for Summary Judgment as to Counts VI and VII against Dr.

Brooks and Armor.

Plaintiff also brings a claim of medical malpractice against Nurse Sadler in Counts

VI and VII.  Defendants ask for summary judgment on these claims because Plaintiff has

not offered a proper expert to opine on the applicable standard of care for nurses.[23]

(Defs.' Mem. Supp. at 21, 29–31.)  The Virginia Medical Malpractice Act (the

"VMMA") requires that an expert "demonstrates expert knowledge of the standards of

the defendant's specialty . . . and has had active clinical practice in either defendant's

specialty or a related field of medicine within one year of the date of the alleged act or

omission forming the basis of the action."  Va. Code § 8.01-581.20.[24]  These

---

[21] (*See* Dr. Joshua Report; Dr. Joshua Dep. Part II)

[22] (*See* Dr. Cohen Report at 16.)

[23] Defendants argue that the lack of a nursing expert also requires the entry of summary judgment on the medical malpractice claims against Armor to the extent that those claims involve malpractice by any of Armor's nurses.

[24] While, in a federal district court, the Federal Rules of Evidence control the admissibility of expert testimony, "because the testimony at issue here [is] required for a medical malpractice claim under Virginia law, the sufficiency of its substance . . . is governed by state law." *Creekmore v. Mayview Hospital*, 662 F.3d 686, 690 (4th Cir. 2011).

requirements are sometimes described as the "knowledge requirement" and the "active clinical practice requirement." *Wright v. Kaye*, 593 S.E.2d 307, 311 (Va. 2004).

Defendants contend that, since Plaintiff's experts are not "nurses and do not have an active clinical practice in nursing," their testimony is not admissible. (Defs.' Mem. Supp. at 30.) The VMMA's requirements, however, are not so formal. A doctor may testify to the standard of care applicable to nurses so long as he or she has relevant expertise and an active clinical practice *related* to that standard of care. *See Creekmore*, 662 F.3d at 691; *Jackson v. Qureshi*, 671 S.E.2d 163, 168 (Va. 2009); *Cf. Christian v. Surgical Specialists of Richmond, Ltd.*, 596 S.E.2d 522, 524 (Va. 2004) ("[T]here is no rigid formula to determine the knowledge or familiarity of a proffered expert concerning the Virginia standard of care." (quoting *Henning v. Thomas*, 366 S.E.2d 109, 112 (Va. 1988))).

The *Creekmore* case serves as a clear example. There, the question was whether a doctor could testify to the standard of care required of nurses monitoring a high-risk, postpartum patient with preeclampsia. 662 F.3d at 692. The doctor seeking to testify to the standard of care had experience monitoring patients with preeclampsia, maintained an active obstetric practice, and noted that the standard of care for doctors and nurses was not different. *Id.* The Fourth Circuit held that the doctor qualified as an expert under the VMMA because he had relevant knowledge and a related active clinical practice. *Id.*

In this case, the standard of care concerns how nurses and administrative staff monitor and treat an incarcerated patient with severe diabetes in a prison. While Plaintiff offers three experts, Dr. Mark Davis is the most on point. The uncontroverted evidence

shows that Dr. Davis has served, and currently serves, as a medical care provider in a

state correctional setting for at least four years. (Dr. Davis Decl. and CV at 20, ECF No

130-25.) In his clinical practice, he works alongside nursing staff to treat incarcerated

patients. (*Id.*) He has experience training nurses and studying their role in healthcare

more broadly as well. (Dr. Davis Dep. 131:2–132:19.) Given the record currently before

the Court, Dr. Davis qualifies as an expert on the standard of care for nurses and

administrative staff in a prison setting.[25] Thus, the Court will deny Defendants' Motions

for Summary Judgment on Counts VI and VII against Nurse Sadler and Armor.

## E.    Counts IX and X

In Counts IX and X, Plaintiff alleges that Armor negligently hired and negligently

retained Dr. Brooks as the Medical Director at Sussex II, respectively. Defendants and

Plaintiff move for summary judgment on both counts.

Virginia recognizes the independent tort of negligent hiring and the independent

tort of negligent retention. *Se. Apts. Mgmt., Inc. v. Jackman*, 513 S.E.2d 395, 397 (Va.

1999).[26] To prove both, a plaintiff must show that the employer hired or retained an

---

[25] Because Plaintiff need only show one expert qualifies to satisfy the VMMA, the Court need not analyze whether Plaintiff's other experts qualify. Va. Code § 8.01-581.20. The Court also does not reach the question of whether Defendants' allegedly negligent acts "lie within the range of the jury's common knowledge and experience" and thus do not require expert testimony to prove. *Coston v. Bio-Med App. of Va., Inc.*, 654 S.E.2d 560, 562 (Va. 2008).

[26] The only distinguishing factor between these two causes of action is the underlying negligent act. *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 473–74 (Va. 2019). For a claim of negligent hiring, the alleged act is hiring the employee in the first place. *Id.* at 627. For a claim of negligent retention, the alleged act is failing to terminate the employee. *Philip Morris Inc. v. Emerson*, 368 S.E.2d 268, 279 (Va. 1988). While it seems repetitive to keep both causes of action in the same case, the Court sees no authority to justify retaining one claim in favor of the other. More importantly, because the elements of a negligent hiring and

employee "with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the [employee] posed a threat of injury to others." *Church of God in Christ*, 831 S.E.2d at 473 (quoting *Jackman*, 513 S.E.2d at 397); *see id.* at 474 (using similar language to describe the tort of negligent retention).

On these Counts, the parties' disagreement is straightforward. Defendants assert that Dr. Brooks' history of medical malpractice and disciplinary actions did not create a foreseeable threat of injury to Plaintiff (Defs.' Mem. Supp. at 31–33), while Plaintiff argues that Dr. Brooks' history is so egregious that no reasonable juror could find that it did not create a foreseeable threat of injury (Pl.'s Mem. Supp. at 32–33).

Based on the record at this stage, there is a genuine dispute of material fact as to whether Dr. Brooks' history of malpractice and disciplinary actions created a foreseeable threat of injury to Washington. *See Church of God in Christ*, 831 S.E.2d at 473. The undisputed evidence shows that Dr. Brooks has a checkered history of disciplinary actions and malpractice. He received a sanction from the U.S. Navy in 1986 which resulted in a loss of privileges. (Dr. Brooks General Info. at 3, ECF No. 124-21.) In 1996, Dr. Brooks settled a malpractice suit for improperly choosing the method used for delivering a newborn. (*Id.* at 4; Discip. Docs. at 19–22, ECF No. 124-28.) In 2013, he settled another suit in which his "inadequate skill level" during a surgery and a

---

negligent retention claim substantially overlap besides the negligent act itself, the Court will analyze them together.

communication breakdown led to a fatal injury. (Discip. Docs. at 14.) In 2014, Dr. Brooks also had his medical license restricted for a time by the Virginia Board of Medicine. (Consent Order, ECF No. 124-23.)

While Defendants do not dispute Dr. Brooks' history, they do argue that such history could not possibly lead Armor to foresee that Dr. Brooks would mismanage Plaintiff's diabetes care. (Defs.' Mem. Supp. at 32.) This argument, however, misses the mark. Negligent hiring and retention claims do not require that the employer should have expected the *exact* type of injury that eventually occurred. *See Interim Pers. of Cent. Va., Inc. v. Messer*, 559 S.E.2d 704, 708 (Va. 2002). These claims only require that the injury "in view of the circumstances, could reasonably have been anticipated by a prudent person, but not for [injuries] which, though possible, were wholly improbable." *Id.* With knowledge of Dr. Brooks' extended history of malpractice and indiscretion, a reasonable, prudent person could conclude that he may cause future injuries to patients by misdiagnosing or mismanaging their medical care. Thus, Defendants' Motion for Summary Judgment on Counts IX and X will be denied.

But the question remains whether summary judgment for Plaintiff is appropriate. At this stage, summary judgment for Plaintiff on Counts IX and X is also not warranted. Taking all reasonable inferences in Defendants' favor, a jury could conclude that Dr. Brooks' history is not substantial enough to find Armor negligent. Malpractice suits are common in the practice of medicine, and Dr. Brooks' past mistakes in medical care were not in the fields that he was hired to practice in at Sussex II. (*See* Dr. Brooks General

30

Info.) A jury is the proper body to decide this issue. Therefore, Plaintiff's Motion for Summary Judgment on Counts IX and X will also be denied.

**F.     Count XI**

Count XI alleges that Defendants negligently inflicted emotional distress upon Plaintiff by inadequately treating his diabetes and toe ulcer. (SAC ¶ 338.) A claim for negligent infliction of emotional distress is strictly limited in Virginia. *Dao v. Faustin*, 402 F. Supp. 3d 308, 321 (E.D. Va. 2019). A plaintiff cannot recover for emotional disturbance alone. *Id.* (quoting *Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973)). Instead, a plaintiff must show that he or she suffered some sort of physical injury that "was the natural result of fright or shock proximately caused by the defendant's negligence." *Hughes*, 197 S.E.2d at 219.

In his Complaint, Plaintiff alleges that he suffered chest pain, back pain, and headaches because of his emotional distress (Pl.'s Mem. Opp'n at 30; *see* SAC ¶ 174), but at the summary judgment stage, Plaintiff must point to some evidence in the record.[27] (*See* Report of Dr. Marcello, ECF No. 124-27 (failing to list any physical injury caused by Plaintiff's emotional distress).) With no evidence in the record that Plaintiff suffered any physical injury proximately caused by his emotional distress, the Court will grant Defendants' Motion for Summary Judgment as to Count XI.

---

[27] Furthermore, even if Plaintiff could point to evidence that he suffered headaches or chest pain, he would also have to show evidence that these symptoms were not "manifestations" of the emotional distress but instead "differ[ed] from the typical symptoms of an emotional disturbance." *Dao*, 402 F. Supp. 3d at 321; *see Myseros v. Sissler*, 387 S.E.2d 463, 466 (Va. 1990). Plaintiff points to nothing in the record as to this question either.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's Motion for Summary Judgment and grant in part Defendants' Motion for Summary Judgment.  Summary judgment will be granted for Defendants as to Counts I and II against Nurse Sadler and Armor, Count III against all Defendants, and Count XI against all Defendants.  On all other Counts, Defendants' Motion for Summary Judgment will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: **January 7, 2022**
Richmond, Virginia